PATRICIA BRECKENRIDGE, CHIEF JUSTICE,
concurring in part and dissenting in part.
I agree with the discipline imposed by the majority opinion. I respectfully differ from the majority opinion’s findings and analysis, however, as to the rules violated by Mr. Krigel. While I find that Mr. Krigel violated Rule 4-3.3(a)(3), Rule 4-4.1(a), and Rule 4 — 8.4(d), I do not believe *303 that Mr. Krigel’s failure to provide factual information to a potential opposing party constituted a violation of Rule 4-4.4(a).
I agree with the following factual findings made by the disciplinary hearing panel:
12. [Mr. Krigel] first met with the expectant mother and her family on March 11, 2010. At that meeting, [Mr. Krigel] was provided background on the relationship between the expectant parents and how it had deteriorated after the disclosure of the pregnancy to their families. The expectant mother indicated that she and the expectant father had originally planned to raise the child together, but with the deterioration of the relationship it would be best for the child to be adopted by a family.
13. During the first meeting between [Mr. Krigel] and the expectant mother, [Mr. Krigel] was advised of the name and whereabouts of the expectant father and the due date of April 8, 2010. The expectant mother and her family told [Mr. Krigel] that the expectant parents were to communicate only through attorneys.
14. At this meeting the expectant mother and her family advised [Mr. Krigel] that the expectant father would not consent to an adoption.
15. Also at this meeting, [Mr. Krigel] explained to the expectant mother her rights under Missouri law and the rights of a biological father to assert paternity, [Mr. Krigel] testified that this explanation included a description of the time-frames within which an expectant father was to assert his parental rights in order to have his consent required for an adoption.
16. At the March 11, 2010 meeting [Mr. Krigel] was retained to assist the expectant mother with pursuing termination of her parental rights in anticipation of a subsequent adoption proceeding.
17. There was no réasonable doubt in the minds of the expectant parents or their counsel as'to the actual paternity of the child.
18. In his representation of the expectant mother [Mr. Krigel] -employed what he referred to as a “passive strategy.” Under this strategy [Mr. Krigel] and his client would “actively do nothing” to communicate with the expectant father or his counsel, and would not advise the expectant father or his counsel of adoption plans, the actual birth of the child, and the institution of any legal proceedings.
19. On or about March 19, 2010; [Mr. Krigel] received a call from the expectant father’s attorney, Mr. Zimmerman, whom [Mr. Krigel] had known since junior high school. [Mr. Krigel] knew that Mr. Zimmerman practiced law primarily in Kansas and did not believe that Mr. Zimmerman typically handled adoption or paternity matters;
20. In this call, Mr. Zimmerman told [Mr. Krigel] that he represented the expectant father, and that the father wanted to raise the child and would not consent to an adoption. In response, [Mr. Krigel] indicated to Mr. Zimmerman that, without father’s consent, there would not be an adoption. Mr. Zimmerman took [Mr. Krigel’s] comment to be a statement of fact. Following their call, Mr. Zimmerman heard nothing further from [Mr. Krigel] with respect to the pregnancy, the birth of the child, or the institution of any adoption proceedings.
21. In the March 19, 2010 call, Mr. Zimmerman told [Mr. Krigel] that he believed the expectant parents, needed to have some counseling about their situation, without involvement of their respective families. [Mr. Krigel] suggest *304 ed to Mr. Zimmerman that they, meet with Ms. Merryfield. At the time of [Mr. Krigel’s] discussion with Mr. Zimmerman, [Mr. Krigel] knew Ms. Merry-field had already begun working with the expectant mother.
22. Following the call with [Mr. Krigel], Mr. .Zimmerman contacted Ms. Merry-field to set up an appointment for the expectant parents to receive counseling about their situation and how they might come to, agreement as to a course of action. „That meeting occurred on March 22, 2010. [Mr. Krigel] testified that he would not.have.mentioned his “passive strategy” to.Ms. Merryfield because “she would have understood exactly what we were doing” and talking about it wouldn’t be necessary.
23. At the March 22 meeting, the expectant father said he would not consent to an adoption and that he wanted to raise the child, preferably with the expectant mother.
24. Following the March 22 meeting, Ms. Merryfield advised [Mr. Krigel] that ■the expectant father stated he did,not want to consent to--an adoption. Ms. Merryfield’s assessment of the expectant father was that he was quiet, sad and passive, and she advised [Mr. Krigel] that she thought the expectant father wasn’t likely .to, contest the adoption.
25. Late in March 2010, the expectant mother sent the expectant father a message falsely stating that her doctor had revised the due date from April 8 until May 1. The expectant father had been barred from attending the doctor appointments with the expectant mother and was deceived by her statements.
26; The baby was born on April 3, 2010. Neither the father nor his attorney was notified of-the birth. The father’s name was not shown on the birth certificate. ... [T]he failure to notify the father or his attorney was purposeful and based on legal advice provided by [Mr. Krigel], and was designed to impair the father’s ability to assert his parental rights.
27. On April 6, 2010 a hearing was held in Jackson County, Missouri before Commissioner Merrigan, for the purpose of having the birth mother tender her consent tq terminate her parental rights, preparatory to adoption proceedings being instituted. [Mr. Krigel] appeared on behalf of the mother. Neither the father nor his attorney received notice of the hearing and neither was aware of the birth of the child.
28. At the April 6, 2010 hearing, in response to [Mr. Krigel’s] questioning, the mother provided false testimony, stating that she had done nothing to defraud or mislead the father which was not true in light of the fact she had given him false information regarding the expected due date. [Mr. Krigel] testified ... that he was not aware that' the mother had provided the father with a false due date.
29. At the April 6 hearing, in response to [Mr.' Krigel’s] question, the mother agreed that the father “had been consulted at length about the matter.” [Mr. Krigel] knew that his “passive strategy” called for no communication following the initial counseling session with Ms. Merryfield and that his questioning suggested to the Court that there had been more consultation than was the case.
30. [Mr. Krigel] testified ... that he knew the father believed the mother’s due date to be April 8. Having instructed his client not to communicate with the father, at the time of the April 6 hearing [Mr. Krigel] was aware that his strategy had prevented the father from knowing that the baby had been born, and from coming forward in advance of the April 6 hearing. [Mr. Krigel] was *305 also aware that the father had consistently asserted his paternity, expressed his desire to raise the child, and stated his opposition to adoption.
31. Nevertheless, at the April 6 hearing, in response to a question- from [Mr. Kri-gel], the mother agreed with [Mr. Kri-gel’s] statement that “even though you’ve talked to him and his family at some length, he has not stepped forward since the birth of the child claiming any rights to the child.” [Mr. Krigel] elicited this- misleading testimony knowing that his “passive strategy” had ensured that the father would not know of the birth. Further, [Mr. Krigel] posed his question fully aware'that the father had consistently claimed rights to the child.
32. [Mr. Krigel’s] questioning of the mother at the April 6, 2010 hearing, while addressing certain statutory elements, was designed to present to the Court the incorrect impression that the father was not interested in the birth of the child or in asserting his parental rights, when [Mr. Krigel] knew that was not the cáse. •
33. Also on April 6, 2010, immediatéíy following the Consent to Terminate hearing in which [Mr. Krigel] participated, a Motion to Transfer Custody and for Adoption was heard by Commissioner Merrigan and custody of the child was transferred to prospective adoptive parents.[1]
34. The father learned of the child’s birth and the mother’s fraudulent statements at some point between May 3 and May 12, 2010. He learned this information indirectly, and not from the mother or [Mr. Krigel]. He promptly placed his name on the Putatiye Father Registry. Later in May he learned that adoption ■proceedings had already been instituted and he moved to intervene.
35. The father saw his child for the -first time in a one hour supervised visit when the child was two months old. He next saw the child in one and one-half hour weekly supervised visits beginning when the child was five months old. After litigating visitation issues he obtained unsupervised visitation rights for seven hours a week when the child was eight months old. 'During-all of this time the child was in the custody-of the proposed adoptive parents.
36. On May 6, 2011, Judge Roldan of the Jackson County Circuit Court entered Judgment in the adoption proceeding, denying the petition of the adoptive parents and awarding legal and physical custody of the child to the father.
37. In establishing his parental rights and opposing the adoption, the father or his family incurred between $50,000 and $70,000 in attorney’s fees.
38. To the extent the mother provided fraudulent information to the father concerning the supposed due date for the .child, that behavior is not relevant to-the Panel’s assessment of potential professional misconduct • on the part of [Mr. Krigel]. . . > -
Based on these factual' findings, I -agree with the majority opinion that Mr. Krigel violated Rule 4-3.3(a)(3) when he -knowingly elicited and permitted false and misleading testimony at the April 6, 2010 hearing that effectively represented to and caused the .trial court to believe that Birth Father had knowledge of the birth of the child and had not done anything to assert his parental rights. These facts-also support the majority opinion’s finding that Mr. Krigel violated Rule 4-4.1(a) in that he knowingly made a false statement of material fact to *306 a third person when he told Mr. Zimmerman that there would not be an adoption without Birth Father’s consent.
I would not find that said facts support the majority opinion’s holding that Mr. Krigel violated Rule 4-4.4(a). Rule 4-4.4(a) provides that “[i]n representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person[.]” The majority opinion finds that Mr. Krigel violated Rule 4-4.4(a) by actively concealing factual information from Birth Father and Birth Father’s counsel so that his client, Birth Mother, would prevail. In doing so, the majority opinion reasons that Mr. Krigel’s actions served no substantial purpose other than to impair and delay Birth Father’s assertion of his parental rights. I recognize that, because the purpose of adoption proceedings is to protect and determine the best interest of the child,[2] the parties to such proceedings take on somewhat different roles than in a typical adversarial setting. But even being mindful of the special nature of such proceedings, the majority opinion’s finding would require an attorney to divulge to a potential opposing party information that is not only detrimental to his or her client but also information that the majority opinion does not show the party had a legal duty to disclose at that time. Therefore, to the extent Mr. Krigel concealed information from Birth Father and Birth Father’s counsel, he did so to avoid harm to his client. Here, Mr. Krigel has been found to have violated Rule 4-4.1(a) for giving false information to Birth Father’s attorney. I would find that such a rule violation sufficiently covers Mr. Krigel’s conduct and, under these circumstances, I would not find that Mr. Krigel violated Rule 4-4.4(a).
Accordingly, I dissent from the majority opinion’s finding that Mr. Krigel violated Rule 4-4.4(a), Nevertheless, I agree that the multiple acts of professional misconduct committed by Mr. Krigel justify the six-month suspension from the practice of law, with execution of the suspension stayed subject to Mr. Krigel’s completion of a two-year term of probation in accordance with conditions imposed by this Court. I, therefore, concur in the majority opinion with respect to the discipline imposed.

. Although not found by the disciplinary hearing panel, I note that the adoptive parents paid for the legal services Mr. Krigel rendered to Birth Mother.

. Section 453.005.1, RSMo 2009, provides that pertaining to adoption “shall be construed as to promote the best interests and welfare of the child in recognition of the entitlement of the child to a permanent and stable home.”